18650

Hattie S. PORTER, Harry Salters, Willie Salters, Delia Salters, Amos Salters, J. W. Salters, Geneva S. Tisdale, Nancy S. McClary, and Evelena L. Salters, Appellants, v. Marie S. SCOTT, Raymond Scott, Marion Salters, Nathan Salters, and L. M. McClary, of whom Marie S. Scott and Raymond Scott are Respondents, and Marion Salters, Nathan Salters, Frank Salters, Rebecca Salters and Isaac Salters are Appellants.

(154 S. E. (2d) 679)

*Messrs. R. E. Harrell, Wendell O. Brown* and *L. L. Lesesne,* of Kingstree, *for appellants,*

*William E. Jenkinson, Esq.*, of Kingstree, *for respondents,*

May 10, 1967.

LIONEL K. LEGGE, Acting Associate Justice:

In this action for partition and sale of a tract of thirty-one acres in Williamsburg County appeal is from a decree of the Honorable James Hugh McFaddin, Judge of the Third Judicial District, adjudging the defendant Marie S. Scott to be the sole owner of said land.

It is undisputed that the land in question, located in the Dutch Neck section of Williamsburg County, was conveyed to Amos Salters by Katie Burgess and others by deed dated March 19, 1917, and recorded in that County on May 14, 1917, in Book A-12, at page 598; that the said Amos Salters died intestate in 1917; that the respondent Marie S. Scott is the only child of Monroe Salters, who was the only child of Amos by his first wife, Sarah; and that Monroe and his wife died intestate in 1934.

The plaintiffs contend that Amos Salters' second wife and widow was a woman named Sylvia, with whom he lived on

what was known as the Stoll farm and by whom he had several children. These children or their descendants comprise the plaintiffs and all of the defendants except Marie S. Scott, her husband Raymond Scott, and L. B. McClary, the holder of a mortgage given in 1950 by one of Sylvia's children on his claimed interest in the tract of land in question.

The defendants Marie S. Scott and Raymond Scott, who are respondents here, contend that Amos' second wife and widow was Carrie Brownfield Salters, with whom he lived in the Dutch Neck section and by whom he had no children; that Amos' relationship with Sylvia was illicit and their progeny were not his heirs; and further, that in addition to being Amos' sole heir, Marie acquired title to the said land by adverse possession.

Two basic issues are raised by the pleadings and proof, *viz.*: 1. Was Amos' lawful second wife Carrie, or Sylvia? 2. Has Marie established title by adverse possession? Both issues are factual, and their solution must depend upon the comparative credibility of the testimony of appellants' witnesses on the one hand and that of respondents' witnesses on the other.

The brief report of the Special Referee, after summarizing the pleadings and stating the questions for determination, but without discussion of the evidence, proceeds as follows: "After a careful review of the testimony, and personally knowing the main witnesses I find and so hold that the material allegations of the complaint are true and that the tract of land described in the complaint is owned by the following parties as tenants in common in fee in the following proportions, to wit: * * *." It then proceeds to set forth the fractional interest of each of the parties, including Marie S. Scott and the issue of Amos and Sylvia, thereby finding that Sylvia was the lawful second wife of Amos.

The well-considered circuit decree reviewed the evidence in detail. To quote from it:

"On the issue of pedigree, there is little doubt that Amos lived with the woman Sylvia and that the plaintiffs and the minor defendants are his children and descendants by her. The evidence, however, is very strong that Amos had a living wife, Carrie, whom he married previous to the relationship formed with Sylvia, and who survived him about fifteen years.

"The evidence establishes that a few years after marrying Carrie, Amos began working in another community some distance away from the home where he and Carrie lived. He would be away during the week and on weekends he would return home to Carrie. During this time he formed the relationship with Sylvia in the community where he worked. He established a household there, had several children by Sylvia and for all practical purposes was the husband and father of this family. This dual relationship with the two women continued until his death in 1917.

"Of significant bearing on the case is the circumstance that the plaintiff, Hattie S. Porter, is the only relative or alleged relative who testified in behalf of the plaintiffs. The other relatives and residents of the community where these people lived and died all testified that Carrie was the second wife and widow and that the connection between Amos and Sylvia was illicit. R. M. Wilson, a school teacher, who is not related to the family and who was a thirteen-year-old boy when Amos died, is the only exception. His age at the time these events occurred casts serious reflections on his testimony.

"The only other witnesses for the plaintiffs were two white men, L. B. McClary, who held the mortgage, and J. D. McCullough. Both of these men lived in the community where Amos lived with Sylvia on what was known as Stoll farm and knew nothing about Amos' life in the Dutch Neck section where he had his home with Carrie. This court takes judicial notice that the knowledge of white people about the affairs of colored people is often very limited indeed.

"As stated, there seems to be no question that Amos lived with the woman Sylvia down on the Stoll farm and had

children by her. The great weight of the evidence is, however, that he was actually married to Carrie. The witnesses in a position to know were all unanimous on this. Hulman Nelson, age 85, testified that his father and Amos were like brothers, and that Carrie was Amos' second wife and widow, and that Amos had a relationship with Sylvia but that she wasn't his wife. Lizzie Woods, age 85, testified that Amos was her greatuncle and died at the home of her mother, Oreanna Hall; that she knew when Carrie and Amos were married, and had attended the funeral when he died; that she helped to prepare Carrie's body for burial on her death some years after Amos' death. Emma Chandler Mabry, whose father was Isiah Chandler, a nephew of Amos, testified that they had taken care of Carrie until she died during her last illness, and that she knew her as Amos' widow. Cleveland Moore, age 85, stated that his father was clerk of Bethlehem Church where Amos and Carrie were married and remembers his father saying that they had gotten married at the time of the marriage. All the witnesses in this case, three of whom were eighty-five and two seventy-five, who were on the scene and who were old enough to have known of what was going on, without exception, established Carrie as the true wife."

The testimony of the elderly witnesses for the respondents, obviously unreliable as to dates, is quite definite as to events and their sequence. Painstaking study of all of the evidence convinces us that Carrie was Amos' lawful wife and widow; that the relationship between Amos and Sylvia was illicit; that the issue of that union did not inherit from him; that Monroe Salters was the only lawful child of Amos; that the respondent Marie S. Scott is the only child and heir of Monroe Salters, whose wife had predeceased him; and that the parties to this action other than the said Marie S. Scott have no right, title or interest in or to the property here involved. The conclusion thus reached disposes of the claims of ownership by the parties other than Marie S. Scott, adjudges her to be the sole owner of the

interest of her father, Monroe, in said property, and enables us to affirm the circuit decree in that regard without adjudication or discussion of the issue of adverse possession, which the decree resolved in her favor.

It appears undisputed that both Amos and Monroe died intestate; there is certainly no evidence that either of them left a will. Since Amos was survived by his widow, Carrie, and his only child, Monroe, title to the property passed, upon Amos' death intestate, to Monroe and Carrie, each having an undivided interest. The record here is completely blank as to what happened to Carrie's interest upon her death, which according to the testimony occurred in 1931 or 1934. If she died intestate, who were her heirs, if any? None of the parties to·the cause is joined in that capacity. Monroe, it will be recalled, was her stepson, not her son. In this state of the record we cannot affirm the circuit court's holding that Marie S. Scott is the sole owner of the land in question.

To the extent that it holds that Marie S. Scott is the present owner of Monroe's interest in the property and that the parties other than Marie have no right, title or interest in or to said property, the decree appealed from is affirmed. To the extent that it holds that Marie is the present owner of Carrie's interest therein, it is reversed for lack of evidentiary support.

Affirmed in part, and reversed in part.

Moss, C. J., Lewis and Bussey, JJ., and George T. Gregory, Jr., Acting Associate Justice, concur.